IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUDITH BARNETT

    *Plaintiff*

v.

PA CONSULTING GROUP, INC.

    *Defendant.*

Civil Action No. 04-1245 (BJR)

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

## I.     INTRODUCTION

This matter comes before the court on Defendant PA Consulting Group, Inc.'s ("PA") Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rules for the District of Columbia 7.1 and 56.1. From October 2000 to November 2003, Plaintiff Judith Barnett worked as a Managing Consultant in PA's Transportation Group. In October 2003, PA merged the Transportation Group into its Information Technology Infrastructure Group ("ITI"), thereby eliminating several positions including Ms. Barnett's. Plaintiff asserts that PA discriminated against her in the reduction in force ("RIF") based on her age and gender. She claims that the RIF disproportionally affected women and older professional

ORDER-1

employees without justification. PA counters that the RIF did not have a discriminatory bias, and asserts that substantial financial setbacks in PA's Transportation Group after the events of September 11, 2001 led PA to reorganize the practice by narrowing its focus and eliminating non-core services. Upon consideration of Defendant's motion and reply, the opposition thereto, as well as the relevant law, the motion for summary judgment is granted.[1]

## II. LEGAL BACKGROUND

### A. *Summary Judgement Standard*

A motion for summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant must support its factual positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the non-moving party must then establish that a genuine dispute as to any material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To meet its burden, the non-moving party must show that "the evidence is such that a reasonable jury could return a verdict" in its favor. *Anderson*, 477 U.S. at 248. Such evidence must consist of more than mere unsupported allegations or denials and must set forth specific facts showing that there is a genuine dispute for trial. *See* Fed.R.Civ.P. 56(c)(1), (e); *Celotex*, 477 U.S. at 322 n. 3. If the

---

[1] On August 30, 2011, Plaintiff filed a Request for Expedition in which she requested that "the motion for summary judgment and other proceedings in this case be addressed as expeditiously as possible." (Dkt. No. 67.). The court will grant the request.

ORDER-2

evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

### B. The ADEA and DCHRA

Pursuant to the ADEA, it is illegal for an employer to terminate, fail to hire or promote, or otherwise discriminate against any individual "because of" such individual's age. 29 U.S.C. § 623. The DCHRA makes it unlawful for an employer to discharge or refuse to hire an individual "wholly or partially for a discriminatory reason based upon the actual or perceived: race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, family responsibilities, genetic information, disability, matriculation, or political affiliation of any individual." D.C.Code § 2-1402.11(a)(1). Discrimination claims under the ADEA and DCHRA have traditionally been analyzed under the *McDonnell Douglas* burden shifting framework. *See Goos v. Nat'l Ass'n of Realtors,* 715 F. Supp. 2, 3 (D.D.C.1989) (because the DCHRA was "modeled on Title VII," courts employ "the Title VII prima facie case analysis established in *McDonnell Douglas*" when analyzing motions for summary judgment); *Mianegaz v. Hyatt Corp.*, 319 F. Supp. 2d 13, 20 (D.D.C.2004) ("[T]he same analytical framework applies to both ADEA and DCHRA claims.").

The D.C. Circuit, however, has instructed that when considering a motion for summary judgment in an employment discrimination case, a district court need not consider whether a plaintiff has actually satisfied the elements of a prima facie case if the defendant has offered a legitimate, non-discriminatory reason for its actions. *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C.Cir.2008). Instead, "the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally

ORDER-3

discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id*. In other words, a court must determine whether "all the evidence, taken together, [is] insufficient to support a reasonable inference of discrimination." *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C.Cir.2009) (citing *Brady*, 520 F.3d at 494–95); *see also Holcomb v. Powell*, 433 F.3d 889, 896–97 (D.C.Cir.2006) ("'[T]he plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason.'" (quoting *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C.Cir.2003))). "[A]ll of the evidence," in turn, means "any combination of (1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer." *Holcomb*, 433 F.3d at 897; *see also Washington v. Chao*, 577 F. Supp. 2d 27, 39 (D.D.C.2008).

A plaintiff bears the burden of persuasion to show that a defendant's proffered non-discriminatory reason for the challenged action is a pretext. *See Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 654 (D.C.Cir.2003). "A plaintiff can carry this burden by showing that a non-discriminatory reason offered by a defendant is false, *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C.Cir.2008), or otherwise 'presenting enough evidence to allow a reasonable trier of fact to conclude that the employer's proffered explanation is unworthy of credence.'" *Wicks v. Am. Transmission Co. LLC*, 701 F. Supp. 2d 38, 45 (D.D.C.2010) (quoting *Desmond v. Mukasey*, 530 F.3d 944, 962 (D.C.Cir.2008)). A plaintiff may also "attempt[ ] to produce evidence suggesting that the employer treated other employees of a different race, color,

ORDER-4

sex, or national origin more favorably in the same factual circumstances" than the employer treated the plaintiff. *Brady*, 520 F.3d at 495.

### III.     FACTUAL BACKGROUND

The following material facts are undisputed, except where noted:

A.     *PA Consulting Group, Inc.*

PA is a large, multinational enterprise that provides business consulting services worldwide. (*See* Exhibit 39 attached to Plaintiff's Opposition to Motion for Summary Judgement ("Pl. Op.").).[2] It is headquartered in London, England, and has offices in more than thirty countries, including the United States. (*Id*.). At all times relevant to this case, PA was headed by Jon Moynihan, the Chairman of the Board and Chief Executive Officer, and Bruce Tindale, the Chief Operating Officer. PA is organized as a partnership. (Deposition of Patrick Kelly taken on September 12, 2007 ("Kelly Dep.") at 16.). The position of Managing Consultant is immediately below that of Partner. (*Id*. at 27.).

In any given year, PA employs somewhere between 160 and 180 people holding the title "Partner". (Deposition  of Jon Moynihan taken on October 30, 2007 ("Moynihan Dep.") at 49.). At the time of this lawsuit, 5 to 12 of the 163 to 179 partners at PA were women,[3] and only 32 women had ever held the title. (*Id*.; Pl. Ex. 10.). Central to this case is the merger of PA's Transportation Group into a larger division, the Information Technology Infrastructure Group ("ITI") in 2003. During this period, ITI had eight partners, none of whom were women. (Kelly Dep. at 35-36, 56-57.). During 2002-2004, ITI employed 37 Managing Consultants and one was

---

[2]      Plaintiff's exhibits attached to the opposition are referred to as "Pl. Ex. ___".

[3]      The parties dispute the exact number of partners and female partners at PA during this time.

a woman. (*Id*. at 72.). During this same timeframe, the Transportation Group employed up to nine women. (Pl. Ex. 1.).

**B.  *Judith Barnett***

Plaintiff Judith Barnett has a diverse employment background. She is a lawyer who, after a brief foray in private legal practice, built a career in national government. She served in four presidential administrations, including a tenure as Deputy Assistant Secretary for Trade Development in the Department of Commerce during the Clinton Administration. (Deposition testimony of Judith Barnett taken on July 12, 2007 "Barnett Dep." at 37-43.). Following her service in the Clinton Administration, she returned to the private sector and joined a consulting firm, Hagler Bailly/GKMG, in its Transportation Group. (*Id*. at 49 and 52.). While at Hagler Bailly/GKMG, she developed an practice in international trade, focusing on the Middle East and North Africa. (Barnett Dep. at 50.).

**C.  *Ms. Barnett Joins PA***

In the Fall of 2000, PA acquired Hagler Bailly/GKMG and the entire Transportation Group transferred over to PA. (Barnett Dep. at 63.). Both before and after the acquisition, the Transportation Group was headed by Jim Miller. (*Id*. at 117.). The Transportation Group's consulting services primarily focused on airport and/or airline related work. (*Id*. at 51.). After the acquisition, Ms. Barnett repeatedly attempted to transfer to another group within PA because she felt that her Middle East/North Africa trade practice did not fit with the airline/aviation focus of the Transportation Group.[4] (*See*, e.g., Exs. 6, 7, 8, 10, 11 and 13 attached to the Motion for

---

[4]     Ms. Barnett's largest client was Mars, Inc. (Kelly Dep. at 120.). She assisted the company in its international trade in several countries. Ms. Barnett also claims that she "netted" seven new clients valued at $700,000 for PA, sold multiple projects in China, landed a contract to provide services to Khalifa Airlines, and developed a burgeoning trade practice in the Middle East. (*See* Barnett Dep. at 227-230.).

ORDER-6

Summary Judgment.).[5] From 2000 to 2001, Ms. Barnett sent eight written memos and emails asking to move from the Transportation Group because "Transportation is not the group for the type of work I do." (Def. Ex. 7; *see also* Def. Exs. 6, 8, 10, 11 and 12.). She made similar comments in her bi-annual performance reviews, including as late as 2002 when she noted "my practice is quite different from the Transportation practice." (Def. Ex. 8 at 5; Pl. Ex. 6 at 3.).

While at PA, Ms. Barnett received high praise from Mr. Miller. (*See* Deposition of James Miller taken on September 20, 2007 ("Miller Dep.") at 125 ("As an employee, she was tireless. She worked hard. I mean, she was pretty much a 24/7 type of person. As to quality of work, she produced great work for the client. I mean, my impression...[was that her clients]...said great things about her.")). Mr. Miller described her performance for the first half of 2003 as "very good!" (Pl. Ex. 5 at 4.).

### D.     *The Transportation Group's Practice Begins to Fail*

The Transportation Group suffered substantial financial setbacks as a result of the events of September 11, 2001, which had a catastrophic affect on the airline industry. In 2002, alone, the Group was "about a million dollars in debt." (Barnett Dep. pp. 170-171.). Leadership at the highest levels of PA began a review of the Transportation Group. The first step of the review was to diagnose the problem, and in January 2003, Mr. Moynihan commissioned a study of the Group by PA's auditing department. The auditing department examined practice files, interviewed Mr. Miller, and met with some of the group's employees. (Pl. Ex. 4.). Thereafter, on January 27, 2003, Jinesh Shah, PA's Head of Internal Audit, issued a report. (*Id*.). The audit revealed that the Transportation Group suffered from a low utilization rate: "the adverse results are primarily due to low utilization (actual consulting utilization 25% against a budget of 65%).

---

[5]      Hereinafter referred to as "Def. Ex. ___".

ORDER-7

(*Id.* at § 1.2.2.). The audit also noted that some staff members "appear to be coasting," and that some of the Managing Consultants were not "covering their costs". (*Id.* at 4.). The auditors noted that Ms. Barnett appeared to be one of the few who "seems to cover her costs." *Id.* The audit further stated:

> It should be recognized that not all Managing Consultants and Principals are pulling their weight. Those incapable of stepping up to the challenges confronting the Transportation Practice should be counselled out, those with a profitable business stream, but outside the main focus should be allowed to continue, and those with potential to grow and diversify the practice should be given the most help and direction.

(*Id.* at Recommendations § 3-2.).

       E.     *PA Executives Meet to Decide the Fate of the Transportation Group*

After receiving Mr. Shah's audit report, Mr. Moynihan convened a series of "Transportation Practice Review Meetings," the first of which took place in mid-February 2003. (*See, e.g.*, Pl. Ex. 14.). Additional meetings occurred in March, May and September 2003. (Pl. Exs. 14, 24 and 25.). In addition to Mr. Moynihan, the regular attendees of these meetings included Mr. Miller, Mr. Tindale, James Cullen (PA's Global Chief of Human Resources), Annette Wigton (U.S. Human Resources Leader), Ken Rubin (Head of the Infrastructure & Development Services Group ("I&DS")), and Jon Kanter.[6] (*See, e.g.*, Pl. Op. at Ex 14.).

In preparation for these meetings, Mr. Tindale began acquiring information on each of the Transportation Group's employees. On February 11, 2003 Mr. Moynihan sent an email to Mr. Tindale in which he requested that the information Mr. Tindale collected through Jon Kanter and Bill Loose (PA's Global Resource Manager) be "melded" with Mr. Shah's audit report: "i [sic] assume that we would want to meld Bill's comments...with Jinesh's, when coming to a final

---

[6]       It is not clear from the record what position Mr. Kanter held at PA.

ORDER-8

decision on each person? (which [sic] should be taken when and by who?)". (Pl. Ex. 1 at 2.). Mr. Tindale responded: "I'll ask Kate [Price] to arrange for Jinesh's and Bill's comments to be brought together in a single document and redistributed to us before Thursday." (*Id.*). Ms. Price then sent an email to Messrs. Moynihan and Tindale (among others) that stated: "As requested, please find attached a document which combines Bill's and Jinesh's comments. You will see that it's missing some ages—I'll send through an updated copy as soon as I've received that info." (*Id.* at 1.). The attached document was entitled "View of TP Staff". (*Id.* at 1.).

### F.     PA Decides to Restructure the Transportation Group

During the course of the Transportation Practice Review Meetings, it was decided that the Transportation Group needed to be restructured, and that it would benefit from having fewer employees and new leadership. (Moynihan Dep. at 78-79; Kelly Dep. at 100.). In addition, Messrs. Moynihan and Tindale considered merging the Transportation Group with Mr. Rubin's Infrastructure and Development Group at PA. (Pl. Ex. 1 at 3.). Accordingly, in February and March 2003, Mr. Miller considered a number of employees for inclusion in a reduction-in-force ("RIF"). (Pl. Ex. 14 at 2.). Ms. Barnett was not among those considered. (Miller Dep. at 261-262, 290-291, 294-295, 301-305.). At this point, Mr. Miller decided to include two individuals in the RIF, Arnie Levine, a Managing Consultant, age 54, and Robert Tardio, a Principal Consultant, age 74. (Miller Dep. at 300.). Thereafter, Mr. Levine left PA in April 2003 and Mr. Tardio left in September 2003. (Pl. Ex. 24.). Ms. Barnett testified that she thought that both of these terminations made good sense. As to Mr. Levine, she testified that his "revenues weren't existent" and as to Mr. Tardio she testified that "he never billed an hour." (Barnett Dep. at 238 and 326.).

ORDER-9

### G. Patrick Kelly Gets Involved for the First Time

At some point in September 2003, it was decided that the Transportation Group would not merge with the Infrastructure and Development Group, but rather, would be absorbed by the Information Technology Infrastructure Group ("ITI") headed by Patrick Kelly. (Kelly Dep. pp. 94-96; Pl. Ex. 26.). Thereafter, Mr. Kelly participated in the September 23, 2003 Transportation Practice Review meeting. (Pl. Ex. 26.). At the meeting, seven individuals were identified for potential inclusion in the RIF. (*Id.*). Ms. Barnett was still not on the list. (*Id.*).

On September 30, 2003, Mr. Miller met with Mr. Kelly to discuss the Transportation Group staff. (Miller Dep. at 322-323.). The purpose of the meeting was to "introduce [Mr. Kelly] to the transportation practice and ... introduce [Mr. Miller] to the ITI practice...." (*Id.*). During the meeting, Messrs. Kelly and Miller focused on three criteria for evaluating the Transportation Group employees: "skills and capabilities," "performance," and "commitment" to PA. (Pl. Ex. 9.). The rating scale they devised scored employees on a scale of one check mark to three check marks, with three being the highest. *Id*. Ms. Barnett received three check marks for "performance" and "commitment to PA," and two for "skills and capabilities." *Id*. Next to "skills and capabilities," Mr. Miller added the word "Trade." *Id*. After this meeting, Mr. Kelly concluded that the Transportation Group needed to focus its energies more directly on its primary work for airports and airlines. (*Id.* at 103, 224-228.). He claims that it was at this point that he decided that "non-core" services and activities should be eliminated from the Transportation Group through the RIF. (*Id.* at 224-228.). Ms. Barnett claims that this is not true, and that Mr. Kelly made this up in order to justify her termination after she filed suit.

### H. Mr. Kelly Decides to Terminate Ms. Barnett

On October 10, 2003, Mr. Kelly traveled to Washington D.C. to meet with the members

of the Transportation Group in advance of the reorganization. Mr. Kelly met with Ms. Barnett, for the first time, to discuss her trade practice and background. (Kelly Dep. at 150-156.). Mr. Kelly claims that his meeting with Ms. Barnett confirmed his growing understanding that Ms. Barnett's practice was not "core" to the Transportation practice. (*Id*. at 155-156.). He claims that it was after this meeting that he decided to add her name to the group that Mr. Miller had previously identified for inclusion in the RIF. Mr. Kelly testified that the sole reason he included Ms. Barnett in the RIF was the poor fit between her trade practice and the rest of the Transportation Group. (*Id*. at 223-226.). He further testified that he did not consider her utilization, profitability, performance, or revenues. (*Id*. at 223-224.). Ms. Barnett disputes this, claiming that Mr. Kelly is lying to cover for the age and gender bias that tainted her termination.

## I.     PA Implements the RIF

Thereafter, on October 17, 2003, five Transportation Group employees—two men and three women, ages 29 to 57—were notified that their positions were terminated. (Pl. Ex. 37.). Ms. Barnett was one of the members terminated. (*Id*.). She was 57-year-old at the time. Also included in the RIF were:

> Zvezda VanPelt, female, age 29
> Edmund Pinto, male, age 63
> Tammylynn Pertillar, female, age 35
> Garbor Kovacs, male, age 46

(*Id*.). After the October 2003 RIF, eighteen employees remained in the Transportation Group including Lynn McDevitt, a female Principal Consultant who was 58-years-old at the time. (Def. Ex. 21.). This also included six Managing Consultants:

> Barney Parrella, male, age 55
> Michael Flemming, male, age 41
> Sam Fairchild, male, age 49
> Peter Siggins, male, age 43

ORDER-11

Gao Quingguo, male, age 41
Rick Russell, male, age 50

(*Id.*). The following additional members remained after the RIF:

Mark King, male, age 46
Chris Weaver, male, age 29
Mira Aiello, female, age 26
Richard Sullivan, male, age 49
Stephen Blessing, male, age 45
George Novak, male, age 40
Ed Scerbo, male, age 36
Kevin Schorr, male, age 36
Nikhil Takakar, male, age 26
Jim Miller, male, age 47

(*Id.*). In addition, in November 2003, PA decided to close down the Transportation Group's office in China and therefore terminated all of the employees working in that office. The following employees left PA as a result:

Zhao Tong, female, age 37
Zhao Yuan, female, age 30
Zhang Yixin, female, age 30
Na Jin, female, age 27 (later rehired)

(Def. Ex. 19 at Interrogatory Response No. 9.).

J.     *Ms. Barnett Forms The Barnett Group LLC*

On October 18, 2003, Ms. Barnett wrote to Mr. Rubin (PA's Head of Infrastructure & Development Services Group ("I&DS")) regarding the possibility of joining his practice. (Pl. Ex. 33.). Mr. Rubin responded on October 21, 2003, stating that the group's partners had some concerns about her financial performance and concern that she would not be willing to work at the salary I&DS could offer her, but that he was willing to discuss the issue further with the I&DS partners if she was still interested. (Def. Exs. 18 and 19.). Ms. Barnett disputes that Mr. Rubin was willing to offer her a position with I&DS, but regardless, does not recall whether she

ORDER-12

followed up with him. (Barnett Dep. at 294-298.). Instead, she left PA and set up her own company named The Barnett Group LLC one week after receiving Mr. Rubin's email. (*Id*. at 297.).

Ms. Barnett filed the present suit in the Superior Court for the District of Columbia on April 1, 2004, alleging claims of discrimination on the basis of gender and age in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1402.11. (Dkt. No. 1 ¶ 1.). She filed an amended complaint on July 16, 2004 adding a claim pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq. (*Id*. at ¶ 6.). PA removed it to this court on July 26, 2004. (Dkt. No. 1.). Defendant moved for summary judgment after the parties concluded discovery. (Dkt. No. 54.).

## IV.    ANALYSIS

Ms. Barnett alleges that her termination violated the ADEA and DCHRA because it was motivated by two impermissible motives: discrimination against her based on her age and discrimination against her based on her gender. PA, in turn, has offered a legitimate, non-discriminatory explanation for Ms. Barnett's termination:  she was included in the RIF because her trade practice did not fit with the Transportation Group's focus on aviation/airline services. PA has produced evidence in the form of internal reports, communication between management, and sworn testimony, to support its non-discriminatory justification for Ms. Barnett's termination. The record evidence shows that after the events of September 11th, the Transportation Group's practice was struggling financially. (*See, e.g*., Pl. Ex. 4; Barnett Dep. at 170-171.). The communications between management show a team of high level executives contemplating what action to take with respect to the practice. (*See* Pl. Ex. 4, 14, 24, 25 and 26; Kelly Dep. at 94-96; Moynihan Dep. at 78-79.). Eventually, it was decided that the

ORDER-13

Transportation Group would need to be restructured (including changing leadership and terminating some employees) and then merged with PA's Information Technology Infrastructure group. (Moynihan Dep. at 78-79, 130-131.). At that point, the record shows that Mr. Moynihan put Patrick Kelly, the Head of the Information Technology Infrastructure practice, in charge of implementing the RIF, *see* Moynihan Dep. at 130-131, and Mr. Kelly testified that he decided to include Ms. Barnett in the RIF because her trade practice did not fit with the Transportation Group's practice. (Kelly Dep. at 223-224.).

The court finds that PA has produced sufficient evidence to indicate a legitimate, non-discriminatory reason for terminating Ms. Barnett. *See Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 259-260 (1981) (holding that in producing non-discriminatory reasons for its challenged action, the employer is not obligated to support these reasons with objective evidence sufficient to satisfy the "preponderance of the evidence" standard). The burden is now on Ms. Barnett to produce sufficient evidence for a reasonable jury to find that the PA's asserted non-discriminatory reason was not the actual reason it terminated her and that, instead, PA intentionally discriminated against her on the basis of her age and/or gender. *See Smith v. Janey*, 664 F. Supp. 2d 1 (D.D.C. 2009); *Burdine*, 450 U.S. at 253 (plaintiff at all times retains the ultimate burden of persuasion).

### A.     *Mr. Kelly Was the Sole Decision-Maker*

First, Ms. Barnett attempts to discredit PA's stated rationale by showing that PA "lied" about who made the decision to terminate her. (Pl. Op. at 40.). PA claims that Mr. Kelly, and Mr. Kelly alone, made the decision; she claims that Messrs. Moynihan and Tindale were involved in the decision. She argues that a jury could reasonably determine that Moynihan and Tindale were "dissembling to cover up a discriminatory purpose." (*Id*. at 41 quoting *Reeves v. Sanderson*

ORDER-14

*Plumbing Products*, 530 U.S. 133, 147 (2000).

The court finds that the record evidence supports PA's claim that Mr. Kelly was the sole decision-maker. Mr. Kelly testified that he, alone, made the decision to let her go after meeting with her in October 2003. (Kelly Dep. at 150-156; 223-226.). Mr. Miller testified that it was Mr. Kelly's decision to terminate Ms. Barnett. (Miller Dep. at 373.). In fact, he testified that he did not agree with the decision. (*Id*. at 371.). Both Messrs. Moynihan and Tindale testified that they did not participate in the decision to terminate Ms. Barnett. (Moynihan Dep. at 167-168; Tindale Dep. at 79-80.).

The evidence that Ms. Barnett cites to challenge PA's claim that Mr. Kelly was the sole decision-maker, does not create an issue of fact. All of the evidence she points to, the emails between management and the Practice Review Meeting Minutes, only serve to establish that Messrs. Moynihan and Tindale participated in the initial review of the Transportation Group practice, encouraged Mr. Miller to devise and implement a plan to address the poor financial state of the practice, and then to find new leadership for the practice to work with Mr. Miller to make and implement such a plan. (*See, e.g*., Pl. Exs. 14, 24, 25 and 26.). Ms. Barnett points to Mr. Kelly's testimony that he recalls having a conversation with Mr. Tindale at some point prior to Mr. Kelly's meeting with the Transportation Group in October 2003. (Kelly Dep. at 112-114.). However, Mr. Kelly testified that the focus of the conversation "wasn't about closing down the unit" but rather was "can we turn this unit to profit?" (*Id*. at 113.). Mr. Kelly further testified that he did not recall speaking with Mr. Tindale about Ms. Barnett during that discussion. (*Id*.). PA has acknowledged that Messrs. Moynihan and Tindale played a "10,000 foot" role in pushing for a reorganization of the practice. But with respect to the actual decision to terminate Ms. Barnett, PA has steadfastly maintained, and the sworn testimony supports, that Mr. Kelly, alone, made

ORDER-15

the decision.

Ms. Barnett cites Magistrate Judge Kay's Memorandum Order addressing her motion to compel discovery from PA as evidence that Messrs. Moynihan and Tindale "played leading roles" in her termination. (Pl. Op. at 1.). In moving for a broader scope of discovery, Ms. Barnett submitted to the court several of the Practice Review Meeting minutes and e-mails in which Messrs. Moynihan and Tindale participated as described above. Magistrate Judge Kay ruled that "[g]iven the evidence that high level PA executives were involved in identifying at least some of the individuals to be 'RIF-ed' Plaintiff is entitled to explore the role these individuals played in the RIF of her position." (Dkt. No. 35 at 7.). In so ruling, Magistrate Judge Kay emphasized that "relevance for discovery purposes is broadly construed." (*Id.*) (internal quotations and citations omitted). The Magistrate Judge's ruling was limited to the scope of discovery; it certainly is not a ruling on Moynihan and Tindale's involvement in Ms. Barnett's termination.

In short, the only evidence that Ms. Barnett has that PA is lying about who made the decision to terminate her, is her own unsupported allegations. But this, without more, is not sufficient to defeat summary judgment. *See Anderson*, 477 U.S. at 257 ("[A] plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."); *Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994) (plaintiff cannot avoid summary judgment merely by asserting that employer's executives are lying to conceal intentional age discrimination); *Curl v. International Business Mach. Corp.*, 517 F.2d 212, 214 (5th Cir.1975) (a motion for summary judgment cannot be defeated solely by conclusional allegations that a witness lacks credibility); *Fernandez v. China Ocean Shipping, (Group) Co.*, 312 F. Supp. 2d 369 (E.D. N.Y. 2003), *judgment aff'd*, 94 Fed. Appx. 866 (2d Cir. 2004) (merely asserting that a witness may be lying, without any evidence to contradict the witnesses' testimony

ORDER-16

cannot defeat a motion for summary judgment).

### B.    The "View of TP Staff" Spreadsheet

Presumably Ms. Barnett seeks to connect the decision to terminate her to Messrs. Moynihan and Tindale because she believes that she can link the February 23, 2003 "View of TP Staff" spreadsheet with the age column to these individuals. Ms. Barnett again claims that PA "lied" about the identity of the official who ordered the inclusion of the ages on the spreadsheet. (Pl. Op. at 40-41.). She argues that a jury could infer discriminatory intent from this deception.

The "View of TP Staff" is a spreadsheet that is attached to a February 10, 2003 email from Bill Loose (PA's Global Resource Manager) to Andrew Hook (PA's Chief Operating Officer) and Mr. Tindale. (Pl. Ex. 1.). It was later forwarded on to Mr. Moynihan. (*Id*.). Mr. Tindale testified that the document was created when Mr. Moynihan requested that the comments of two employees who audited the Transportation Group be "melded" into one document. (*Id*. at 2.). Mr. Tindale requested that his secretary, Kate Price, complete the project. (*Id*.). Thereafter, Ms. Price sent the spreadsheet along with an email stating, "As requested, please find attached a document which combines Bill's and Jinesh's comments. You'll see that it's missing some ages." (*Id*. at 1.). The email was sent eight months before Mr. Kelly made the decision to terminate Ms. Barnett.

Mr. Moynihan testified that he has "absolutely no idea" why the age category was added to the spreadsheet and he "absolutely did not" ask Ms. Price to include the information. (Moynihan Dep. at 109-111.). In fact, he testified that he had no recollection of ever seeing the document. (*Id*. at 109.). Mr. Tindale testified that he did not know who added the age category to the spreadsheet and that "[he couldn't] imagine why [he] would have, but [he could not give] a definitive yes or no to" whether he requested that the information be included. (Tindale Dep. at

ORDER-17

64.). Both testified that Ms. Price, a secretary in London, might have added the age information on her own, due to the fact it was, at the time, sometimes appropriate to consider age when making employment decisions in England. (Moynihan Dep. at 110-114; Tindale Dep. at 64.).

Despite Ms. Barnett's repeated declarations, there is no evidence in the record that PA attempted to hide the identity of who, if anyone, ordered that the age category be included in the spreadsheet. Moreover, whoever ordered that the age column be included in the spreadsheet, or why it was in the spreadsheet at all, is irrelevant. As discussed *supra*, Mr. Kelly, alone, made the decision to terminate Ms. Barnett, and he testified that he did not see the spreadsheet prior to making his decision, nor had anyone told him about the information contained on it. Ms. Barnett has presented no evidence to suggest otherwise, other than to claim that Mr. Kelly is lying. As previously discussed, this, without more, cannot defeat a summary judgment motion.

Indeed, it is difficult to see the relevance of the document even if it could be tied to Messrs. Moynihan and Tindale. The spreadsheet was created eight months before Ms. Barnett was terminated. In the intervening time between the creation of the spreadsheet and her termination, the Practice Review Meeting minutes record four meetings from February 13, 2003 to September 23, 2003 in which Messrs. Moynihan and Tindale participated. Notably, while a number of employees are identified in those minutes as being considered for possible inclusion in the RIF, Ms. Barnett's name does not appear once. (*See* Pl. Exs. 14, 24, 25 and 26.). It is only *after* Mr. Kelly is brought in to the picture that Ms. Barnett is considered for the RIF. (Miller Dep. at 305-311; Moynihan Dep. at 130-131.).

### C.    *Plaintiff's Pretext Claims*

Next, Ms. Barnett offers seven reasons why PA's proffered reason for terminating her is pretext: (1) two years prior to the RIF, her supervisor, Mr. Miller "rejected [her] suggestion that

ORDER-18

she move to a different practice, thus confirming that she fit well within Transportation"; (2) Mr. Kelly solicited information on the performance history, commitment, and skills of each of the Transportation Group staff members being considered for the RIF, thereby proving that he considered more than just "fit" in reaching his decision; (3) Ms. Barnett had higher performance and commitment scores than all of the five men retained after the RIF; (4) Mr. Kelly and Mr. Miller gave Ms. Barnett the same rating in "skills capability" as five other consultants who were retained after the RIF; (5) Mr. Kelly terminated Ed Pinto as part of the RIF even though his expertise was a "precise match with the 'airline/airport' core work of Transportation"; (6) PA retained young men whose areas of practice did not "fit" with the focus of the Transportation Group; and (7) PA sought to keep Ms. Barnett's key client, Mars Inc., in the Transportation Group even after she was terminated. (*See* Pl. Op. at 32-36.). The court will address each of these claims in turn.

1. *Plaintiff's trade practice did not "fit" with the Transportation Group' Core Services*

Ms. Barnett does not dispute that her trade practice—"a one-stop shop for U.S. companies interested in creating or expanding trade and investment, particularly in the Middle East/North Africa and in China"—did not fit with the core of the Transportation Group's practice—airport security/airline work. (Barnett Dep. at 59.). Ms. Barnett repeatedly acknowledged the "misfit" and attempted to transfer to other practice groups within PA. (Barnett Dep. at 117, Pl. Exs. 5, 6, 8, 9, 10 and 13.). The mismatch was even more pronounced after Mr. Kelly streamlined the Transportation Group's consulting services in preparation the merger with

ITI.[7]

For reasons not in evidence in this case, Ms. Barnett never moved. She claims, however, that "PA management insisted that she remain in Transportation, confirming that her practice fit nicely there." (Pl. Op. at 33.). She cites to her own deposition testimony in which she says "I talked with Jim [Miller] – actually he talked to me and he said I really want you to stay here, he said you are doing great here...." (Barnett Dep. at 33.). The court is unpersuaded. Mr. Miller's alleged statement to Ms. Barnett is hardly evidence that PA management "confirmed" that her practice fit with the Transportation Group. Even if Mr. Miller had told Ms. Barnett that her practice "fit" well with Transportation, such a statement from Mr. Miller would do little to undermine PA's stated rational for terminating Ms. Barnett. The record evidence shows that Mr. Kelly, not Mr. Miller, concluded that Ms. Barnett's practice did not "fit" with the focus of the Transportation practice and that is why Mr. Kelly, not Mr. Miller, selected her for the RIF. Ms. Barnett presents no evidence that Mr. Kelly ever indicated that her practice fit with the Transportation Group, or that he was ever involved in a request by Ms. Barnett to move to another practice.

### 2. PA's Review of Performance Data Is Not Evidence of Pretext

Next Ms. Barnett argues that because Messrs. Moynihan, Tindale, Miller and Kelly reviewed certain performance data related to the Transportation Group employees before the RIF, Mr. Kelly's decision must not have been limited to whether her practice "fit" with the Transportation Group. This argument is based entirely on Ms. Barnett's own conjecture. She offers no deposition testimony or documentary evidence suggesting that performance played any

---

[7] The services offered after the merger were: airport privatization, airport air service development, airport transformation, airline route profitability, airline labor, and airline transformation. (*See* Kelly Dep. pp. 103, 224-228.).

ORDER-20

role whatsoever in Mr. Kelly's decision. Indeed, the evidence confirms the opposite. Mr. Kelly testified unequivocally that: (1) he included Ms. Barnett in the RIF because her Middle East/Africa trade practice did not fit well with the aviation/airline focus of the Transportation Group, and (2) he did not consider Ms. Barnett's performance, utilization rate, revenue generation or profitability in reaching his decision. (Kelly Dep. at 223-224.). In addition, in the RIF "Business Justification Memorandum" dated October 16, 2003, in which the employees selected for the RIF were identified and the rationale for their inclusion was given, Mr. Miller stated:

> [Ms. Barnett's] current work on Middle East and North Africa Trade consultancy no longer fits within the practice as it is essentially a standalone offering. As this is a non-core activity, we will no longer be pursuing these markets resulting in the elimination of the position of trade sector leader...

(Def. Ex. 16.). The mere fact that various senior level executives and managers, while mulling over what to do with the Transportation practice, reviewed performance information on the practice's employees along with other information, does not mean, as Ms. Barnett asserts that Mr. Kelly must have relied on it.

### 3. "Skills and Capability" Are Not the Same as "Fit"

Ms. Barnett's next theory concerns the meeting between Mr. Kelly and Mr. Miller in September 2003 in which Mr. Miller provided Mr. Kelly with his impression of the Transportation Group staff. Mr. Kelly testified that the purpose of the meeting was to allow him to better understand the Group's practice and its members, so that he could formulate a plan to bring the Group to profitability. (Kelly Dep. at 172-177.). During the meeting, Mr. Miller gave Mr. Kelly his impression of each staff member, including their "skills and capability," their "performance," and their "commitment to PA." (*Id.*). During their discussion of Ms. Barnett, Mr.

ORDER-21

Miller gave her two out of three check marks for "skills and capability."[8]

Ms. Barnett, again without citation to the record, asserts that "skills and capability" equate with "fit." She argues that if "fit" were the real criterion, she would not have been chosen for the RIF because five other consultants who were not included in the RIF also received two check marks for "skills and capability" but had lower scores than she in one of the other two categories. (Pl. Op. at 33.). This argument fails because it is premised on the incorrect assumption that "skills and capability" means "fit." This assertion is inconsistent with the record evidence.

Mr. Miller testified that Ms. Barnett's "skills and capability" score, coupled with his note "Trade" in the "skills and capability" column directly to the left of the two check marks ("Trade √√") meant:

> A:    What two checks basically meant was Judith's skill set within her area was very, very good, but her skill set was not transferable across the whole company in terms of the company's propositions. That's what it meant...
>                    ***
> A:    Two basically meant Judith is an expert in trade.
> Q:    Okay.
> A:    But not in aviation.

(Miller Dep. at 336.). Moreover, the only other staff member who received a similar, non-aviation industry caveat on this criteria (George Gao, whose "skills and capability" column reads ("China √√")) was also affected by the RIF. He was offered an opportunity to work with I&DS's practice with a reduction in salary. Mr. Gao accepted the offer and ultimately split his time between I&DS and the Transportation Group's practice with a commensurate reduction in his salary. (Kelly Dep. at 290-294, Errata Sheet, at 14.).

---

[8]    Three check marks was the highest score an individual could receive.

ORDER-22

#### 4. *Other Employees Retained Fit in the Transportation Group Practice*

Ms. Barnett argues that several younger male employees not included in the RIF "'fit' no better than [she]." (Pl. Op. at 34.). She points to Peter Siggins, Sam Fairchild, and George Gao. Ms. Barnett ignores testimony demonstrating that each of these employees had substantial backgrounds or business within the Transportation Group. For instance, Mr. Fairchild, although admittedly a "problem child" for PA, was in many ways a "real asset to the Transportation practice." (Reply at 12; Miller Dep. at 390-391.). He is a former Department of Transportation official, who served in two presidential administrations as Special Assistant to the President, reporting to Andy Card, Acting Assistant Secretary of Transportation, and Deputy Assistant Secretary of Transportation, dealing with transportation matters, including aviation. (Miller Dep. at 390-391.). While at PA, Mr. Fairchild serviced a variety of airline clients including Southwest Airlines throughout his employment. (*Id.*). In addition, Mr. Fairchild was affected by the restructuring of the Transportation Group. As part of the reorganization, PA reduced Mr. Fairchild's salary by nearly $100,000. (Def. Ex. 35.).[9]

Nor does Ms. Barnett's reliance on PA's retention of Messrs. Siggins and Gao advance her argument. Mr. Siggins joined the Transportation Group practice in the summer of 2003, and once there, he worked on aviation and airport-related projects such as the Port Authority proposal to LaGuardia, JFK, and Newark Airports. (Miller Dep. at 340-342.). Finally, as discussed in the preceding section, Mr. Gao was negatively affected by the RIF. (Kelly Dep. at 290-294.).

Ms. Barnett's reliance on *Aka v. Washington Hospital Center*, 156 F.3d 1284 (D.C.Cir.

---

[9] The court also notes that at the time of the RIF, Mr. Fairchild, 49, was only seven years younger than Ms. Barnett—a difference without legal significance for comparator purposes. *See Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758, 763 (D.C.Cir. 2002) (finding that in the absence of other evidence of age discrimination, plaintiff who had been replaced by a worker seven years younger had not made a prima facie showing of age discrimination).

1998) is misplaced. In *Aka*, plaintiff claimed that he was not hired for a position because of his age. The employer countered that plaintiff was not hired because other candidates were better qualified for the position. The district court granted summary judgment for the employer, and, in reversing, the Circuit Court held that "[a] review of the evidence in this case reveals that a reasonable factfinder could conclude that...the balance of qualifications weighed markedly in [plaintiff's] favour...." *Id*. at 267. The court went on to state that "if a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture." *Id*. at 266.

Ms. Barnett attempts to apply the same reasoning to this case. She argues that a jury could reasonably determine that the "significant differences in qualifications" between herself and "Sam Fairchild and his ilk" constitutes "powerful circumstantial evidence of bias." (Pl. Op. at 4.). Ms. Barnett expends a lot of energy arguing that she was more qualified than the younger men who were retained by PA—alleging higher utilization, revenues and performance. (*Id*. at 17, 21-27.). This argument is irrelevant, however, in light of the explicit undisputed testimony from Mr. Kelly that his selection of Ms. Barnett for inclusion in the RIF had nothing whatsoever to do with these factors, but rather was based entirely on the nature of her practice. It is not this court's role to second-guess Mr. Kelly's business judgment on behalf of PA with respect to the optimal form and function of its Transportation Practice and whether Ms. Barnett's position fit into that vision. *See Jackson v. Gonzales*, 496 F.3d 703, 708 (D.C.Cir. 2007) (courts must not second-guess an employer's initial choice of appropriate qualifications; rather, the courts defer to the

ORDER-24

employer's decision of what non-discriminatory qualities it will seek in filling a position); *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C.Cir. 2006) ("We have consistently declined to serve as a super-personnel department that re-examines an entity's business decisions.").[10]

### 6. *Mr. Pinto's Inclusion in the RIF Offers No Evidence of Discrimination*

Ms. Barnett's fifth pretext argument, the fact that Mr. Pinto was terminated as part of the RIF even though his work focused on the airport and aviation sector, does not advance her case. The undisputed evidence shows that a different decision-maker, Mr. Miller, made the decision to include Mr. Pinto in the RIF. (*See* Miller Dep. at 384.). "Different employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a prima facie case of discrimination for the simple reason that different supervisors may exercise their discretion differently." *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000). In addition, it is undisputed that Mr. Miller decided to include Mr. Pinto in the RIF because Mr. Pinto's only client project was coming to a close leaving him no expectation of incoming revenues and because Mr. Pinto had repeatedly announced his intention to resign his position to spend time with his retiring wife. (Miller Dep. at 307-310.).

### 7. *PA Made No Attempt to Retain Mars, Inc.*

Finally, Ms. Barnett argues that PA was "eager" to keep her principal client, Mars, Inc., in the Transportation Group even after she was terminated. The record evidence states otherwise. When questioned at his deposition, Mr. Kelly stated unequivocally that PA did not want to keep

---

[10]    Likewise, Ms. Barnett points to the hiring of Ken Currie one week before she was terminated as "an odd way to reduce operating expenses" and instead is evidence of a "plan to make the staff younger and more masculine." (Pl. Op. at 28.). Mr. Kelly testified that his "job was to turn the [Transportation Group] into profit. The approach I took was to focus the unit hard on delivering its core propositions. [Mr. Miller] put forward a strong case that [Mr. Currie] was important for that, to improve the chances of the success of the unit." (Kelly Dep. at 235-236.). He further testified "[Mr. Currie] has skills that would be valuable to that proposition that was central to the unit…I wanted to at the same time as taking these actions to reshape the team, to be investing in the unit, because you know, the unit needed some support to thrive." (*Id.* at 236.). Given that Mr. Currie's skills "fit" the Transportation Group and Ms. Barnett's did not, PA's hiring of Mr. Currie at this time lends Ms. Barnett no support.

the Mars business in the Transportation practice. (Kelly Dep. at 324.). Mr. Kelly testified further that if Mars had insisted on remaining with PA, he would have subcontracted the work out, eliminating any suggestion that PA intended to carry-on Ms. Barnett's international trade practice. (*Id.* at 324-325.).

The email that Ms. Barnett cites as evidence of PA's intent to keep Mars as a client, in fact, demonstrates the opposite. In mid-October 2003, after PA notified Ms. Barnett of her termination, Ms. Barnett raised with Mr. Miller how to handle the ongoing work she had for Mars. (Pl. Ex. 38.). Mr. Miller emailed Mr. Kelly, and Mr. Kelly responded "I agree we need to do the best by Mars and Judith. For Mars we want their transaction in the middle east [sic] to suceed [sic] and we would also like to maintain the relationships so we could leverage it for other PA work. For Judith we dont [sic] want to chop off her source of income." (*Id.*). Mr. Kelly then went on to set out "a number of options," which included: (1) "allow[ing] Judith to carry out this work stream" herself; (2) PA "provid[ing] the service but [with] Judith sub-contracted" to PA; and (3) "find another way to do the work and hold Judith to her employment contract which says she cant [sic] compete for six months." (*Id.*). Mr. Kelly suggested that "only 1 and 2 are options," but concluded that "1 is the only feasible option," meaning that PA should allow Ms. Barnett to continue performing the Mars work on her own and release her from the non-compete restriction Mr. Kelly believe existed. (*Id.*). Nothing in this email suggests that PA was trying to steal Ms. Barnett's client from her.

### D. *Plaintiff's Statistical Evidence*

Next, Ms. Barnett attempts to bolster her pretext claim by presenting comparative and statistical evidence of gender and age discrimination. She maintains that the RIF must have been the result of age bias because it resulted in the termination of "the four oldest Managing

Consultants in the Transportation Group." (Pl. Op. at 3.). The evidence bears out differently. The composition of the group selected for the RIF, and the remaining Transportation Group employees after the RIF, demonstrates that the termination decisions were made without regard to age. As an initial matter, the court notes that at the time of Ms. Barnett's termination, Mr. Kelly was 49-years-old, only seven years younger than plaintiff. "This is relevant evidence that age discrimination has not occurred." *Clifton v. Federal National Mortgage Association*, 36 F.Supp.2d 20, 26 n. 6 (D.D.C. 1999) (noting decision makers were over forty at the time of termination of plaintiff). In addition, Lynn McDevitt, the oldest employee in the Transportation Group—at age 58 and one year older than Ms. Barnett—remained in the Transportation Group after the RIF. (Def. Ex. 21.). This undercuts Ms. Barnett's age discrimination claim. *See, e.g., Mundy v. Household Finance Corp.*, 885 F.2d 542, 546 (9th Cir. 1989) (reasonable inference of age discrimination is undercut by retention of older employee).

Twelve of the eighteen employees who remained in the Transportation Group—a two-thirds majority—were over the age of forty, and therefore within the class of persons protected by the ADEA. Def. Ex. 21; 29 U.S.C. § 631(a). All of the Managing Consultants who remained in the Group after the RIF were close in age to Ms. Barnett and all were over the age 40. (Def. Ex. 21.). Their ages were 55, 50, 49, 43, 41 and 41. (*Id.*). An age difference of less than ten years is not sufficient to support a showing of age discrimination. *Grosjean v. First Energy Corp.*, 349 F.3d 332, 338 (6th Cir. 2003) (an age difference of less than ten years is not sufficient to support a prima facie inference of age discrimination); *see also O'Conner v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 313 (1996) (the inference of discrimination necessary to sustain an ADEA case "cannot be drawn from the replacement of one worker with another worker insignificantly younger."); *Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758, 763 (D.C.Cir. 2002) (finding that

ORDER-27

in the absence of other evidence of age discrimination, plaintiff who had been replaced by a worker seven years younger had not made a prima facie showing of age discrimination); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000) (in an ADEA action involving a reduction in force, plaintiff must show, among other things, that other similarly situated employees *substantially* younger than plaintiff were treated more favourably); *Grossmann v. Dillard Dep't Stores, Inc.*, 109 F.3d 457, 459 (8th Cir. 1997) (finding that a jury could not reasonably infer age discrimination where an employer, who also was in the protected age group, hired plaintiff when he was forty-eight, fired him when he was fifty-two, and the following year hired four new employees over forty, two of them over fifty).

Moreover, the employees included in the RIF were nearly evenly split between under forty and over forty—ages 25, 29, 46, 57, and 63. (Pl. Ex. 37.). To the extent that Ms. Barnett seeks to include the termination of the employees in Transportation Group's China office in the RIF (which she seeks to do for purposes of her sex discrimination claim), then eight employees total were included in the RIF, with only three of them over the age 40. (*Id.*; Def. Ex. 19.). In the China office, the employees let go were ages 27, 30, 30 and 37. (*Id.*).[11] Their inclusion destroys any inference that PA conducted the RIF in an effort to rid itself of older employees. Ms. Barnett attempts to buttress her age discrimination claim by including the April 2003 termination of Arnie Levine (male, age 54) and the September 2003 termination of Bob Tardio (male, age 74) in the October 2003 RIF. Consideration of Messrs. Levine's and Tardio's terminations in connect with Ms. Barnett's is improper because a different decision maker—Mr. Miller, not Mr. Kelly—made the decision with respect to their separations from PA. Equally important is the fact that Ms. Barnett herself testified that terminating Mr. Levine and Mr. Tardio made good

---

[11]     PA asserts that Ja Nin, age 27, was originally terminated but rehired for administrative purposes. Ms. Barnett does not dispute this claim.

ORDER-28

business sense. In her deposition Ms. Barnett acknowledged that Mr. Tardio's termination was "reasonable" because "he never billed an hour." (Barnett Dep. at 326.). Regarding Mr. Levine, Ms. Barnett testified that his "revenues weren't existent." (*Id*. at 238.). These assertions entirely undercut her allegation that Messrs. Levine's and Tardio's terminations from PA support an inference of age discrimination.

Ms. Barnett's gender discrimination claim fairs no better. Two of the five U.S. employees let go in the October 2003 RIF were male. Adding Messrs. Levine and Tardio to the equation, as Ms. Barnett seeks to do to support her age claim, brings the number to four men and only three women. In shutting down its entire China Transportation operation, PA let go four additional female employees, but there were no male employees in China to terminate. After the RIF, PA retained three female Transportation Group employees—including the oldest member of the practice. These statistics do not create an inference of discrimination.

Ms. Barnett attempts to bolster her sex discrimination claim by citing the historically low number of women at management level in PA. In any given year, PA employs somewhere between 160 and 180 people holding the title "Partner". (Moynihan Dep. at 49.). At the time of this lawsuit, as few as 5 of the 179 partners were women and just 32 women had ever held the title "Partner" at PA. (*Id*.; Pl. Op. at Ex. 10). In 2002-2004, ITI employed 37 Managing Consultants, one of whom was a woman. (Moynihan Dep. at 72; Pl. Op. Ex. 1.). Prior to its merger with ITI, the Transportation Group employed nine women.

PA concedes that the historical statistics overall do not demonstrate equal number of men and women in leadership positions at PA. However, this alone, does not prove discriminatory intent. Notably missing is any evidence that the disparity is the result of discrimination. To the contrary, there is no evidence that women at PA have repeatedly sought and been turned down

ORDER-29

for the partnership rank. *See, e.g., Roberson v. Snow*, 404 F.Supp.2d 79, 91 (D.D.C. 2005) (ruling that plaintiff's attempt to show pretext by pointing to historical disparities within the company was unavailing because he "failed to show actual statistics comparing rates of promotion at [the company] between similarly situated black and white employees, or even statistics comparing rates of hiring black and white applicants to their presence in the applicant pool"); *Metrocare v. Wash. Metro. Area Transit Auth.*, 679 F.2d 922, 930 (D.C.Cir. 1982) (holding that while "[p]roper statistical evidence can be the most important vehicle for showing class discrimination," the plaintiff failed to "compare the percentage of blacks hired for given jobs with the percentage of blacks qualified for those positions" and it was not sufficient to merely show that black managers formed a smaller percentage of the manager pool than did managers of other races).[12]

Having considered all of the record evidence in its full context, the court finds that Ms. Barnett has not met her burden of showing that a reasonable jury could conclude that she suffered discrimination. PA produced evidence of a legitimate, non-discriminatory reason for Ms. Barnett's termination: that her trade practice did not fit within the Transportation Group's practice. Ms. Barnett fails to put forward sufficient evidence for a reasonable jury to find that PA's legitimate, non-discriminatory reason was not the actual reason for her termination, and that PA intentionally discriminated against her on the basis of gender and age. Her claim that PA's witnesses are lying, without more, cannot defeat summary judgment. *See Anderson*, 477 U.S. at 257 ("[A] plaintiff must present affirmative evidence in order to defeat a properly

---

[12]   Ms. Barnett references a 2001 EEOC complaint filed by a former PA employee, Anita Mosner, as evidence of a discriminatory atmosphere. (Pl. Op. at 11.) PA counters that Ms. Mosner's allegations are unreliable in that she later withdrew the complaint and eventually paid two million dollars to PA in settlement of the EEOC complaint and a related lawsuit. (*See* Reply at 10; Def. Ex. 34.). The court agrees and will not consider Ms. Mosner's EEOC filing in ruling on this motion.

ORDER-30

supported motion for summary judgment."). Accordingly, the court will grant PA's motion for summary judgment.[13]

## V. CONCLUSION

Based on the foregoing, the court hereby GRANTS Plaintiff's Request for Expedition and GRANTS Defendant's Motion for Summary Judgment. The case is hereby DISMISSED. DATED this 14th day of October, 2011.

A

Barbara Jacobs Rothstein
U.S. District Court Judge

---

[13] The parties dispute whether Ms. Barnett had the opportunity to join another group at PA after her position with the Transportation Practice was terminated. Because the court finds that Ms. Barnett's termination was not tainted by bias, it is not necessary for the court to address this issue.

ORDER-31